**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| CHARLOTTE YVONNE ANDERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  2:21-CV-44 RLW |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

Plaintiff Charlotte Yvonne Anders brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the Commissioner's final decision denying her application for disability insurance benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401, et seq. and for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381, et seq.  For the reasons that follow, the decision of the Commissioner is affirmed.

**I.  Procedural History**

Plaintiff filed her application for DIB and SSI on January 14, 2019.  (Tr. 12, 124, 278).  Plaintiff claimed that she had been unable to work since August 31, 2011, due to high blood pressure, diabetes, heart problems, post-traumatic stress disorder (PTSD), bipolar disorder, and neuropathy. (Id.)  Plaintiff's application was denied on initial consideration, and she requested a hearing before an Administrative Law Judge ("ALJ").  Plaintiff and her counsel appeared for a hearing on February 27, 2020. (Tr. 42-74).  Plaintiff testified concerning her disability, daily activities, functional limitations, and past work.  Id.  The ALJ also received testimony from vocational expert ("VE") Bob Hammond.  Id.  On May 6, 2020, the ALJ issued an unfavorable decision finding Plaintiff not disabled. (Tr. 14-28).

Plaintiff filed a request for review of the ALJ's decision with the Appeals Council.  On April 19, 2021, the Appeals Council denied Plaintiff's request for review. (Tr. 1-4).  Plaintiff has exhausted her administrative remedies, and the ALJ's decision stands as the final decision of the Commissioner subject to judicial review.  See 42 U.S.C. §§ 405(g), 1383(c)(3).

In this action for judicial review, Plaintiff claims the ALJ's decision is not supported by substantial evidence in the record as a whole.  Specifically, Plaintiff argues that the ALJ's findings regarding Plaintiff's residual functional capacity ("RFC") are not supported by the medical evidence, and the ALJ improperly interpreted "raw medical data."  (ECF No. 14 at 3).  Plaintiff also argues that the ALJ failed to explain the discrepancy between the VE's testimony and job classifications in the Dictionary of Occupational Titles ("DOT").  Plaintiff faults the ALJ for failing to explain in his decision how he resolved that conflict.  Plaintiff requests that the decision of the Commissioner be reversed, and the matter be remanded for an award of benefits or for further evaluation.

With regard to Plaintiff's testimony, medical records, and work history, the Court accepts the facts as presented in the parties' respective statements of facts and responses.[1] The Court will discuss specific facts relevant to the parties' arguments as needed in the discussion below.

## II.  Legal Standard

To be eligible for DIB under the Social Security Act, plaintiff must prove that she is disabled.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Sec'y of Health & Hum. Servs., 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable

---

[1]Plaintiff offered no denials as to Defendant's Response to Plaintiff's Statement of Uncontroverted Material Facts, including the Defendant's additions and clarification as to Plaintiff's own submission of facts.  (ECF Nos. 19 and 20).

physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  An individual will be declared disabled "only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).  The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If the claimant is working, disability benefits are denied.  Second, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his or her ability to do basic work activities. If the claimant's impairment is not severe, then he or she is not disabled.  Third, if the claimant has a severe impairment, the Commissioner considers the impairment's medical severity. If the impairment meets or equals one of the presumptively disabling impairments listed in 20 C.F.R., Part 404, Subpart P, Appendix 1, the claimant is considered disabled, regardless of age, education, and work experience.  20 C.F.R. §§ 416.920(a)(4)(iii), (d).

At the fourth step, if the claimant's impairment is severe but it does not meet or equal one of the presumptively disabling impairments, the Commissioner assesses whether the claimant retains the RFC to perform his or her past relevant work.  20 C.F.R. §§ 416.920(a)(4)(iv), 416.945(a)(5)(i).  An RFC is "defined as the most a claimant can still do despite his or her physical or mental limitations." Martise v. Astrue, 641 F.3d 909, 923 (8th Cir.

2011); see also 20 C.F.R. § 416.945(a)(1). Ultimately, the claimant is responsible for providing evidence relating to his or her RFC, and the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 416.945(a)(3). If, upon the findings of the ALJ, it is determined the claimant retains the RFC to perform past relevant work, he or she is not disabled. 20 C.F.R. § 416.920(a)(4)(iv).

In the fifth step, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If the claimant's RFC does not allow the claimant to perform past relevant work, the burden of production shifts to the Commissioner to show the claimant maintains the RFC to perform work that exists in significant numbers in the national economy. See Brock v. Astrue, 674 F.3d 1062, 1064 (8th Cir. 2012); 20 C.F.R. § 416.920(a)(4)(v). If the claimant can make an adjustment to other work which exists in significant numbers in the national economy, the Commissioner finds the claimant not disabled. 20 C.F.R. § 416.920(a)(4)(v). If the claimant cannot make an adjustment to other work, the Commissioner finds the claimant disabled. Id. In the fifth step, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. Hensley v. Colvin, 829 F.3d 926, 932 (8th Cir. 2016).

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence

test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." Id. (internal quotation marks and citations omitted). Under this test, the Court "consider[s] all evidence in the record, whether it supports or detracts from the ALJ's decision." Reece v. Colvin, 834 F.3d 904, 908 (8th Cir. 2016). The Court "do[es] not reweigh the evidence presented to the ALJ" and will "defer to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence." Id. The ALJ will not be "reverse[d] merely because substantial evidence also exists in the record that would have supported a contrary outcome, or because [the court] would have decided the case differently." KKC ex rel. Stoner v. Colvin, 818 F.3d 364, 370 (8th Cir. 2016).

### III.  The ALJ's Decision

The ALJ considered Plaintiff's claim for SSI benefits from December 22, 2017, through the date of his decision.[2] (Tr. 14-15). The ALJ applied the above five-step analysis and found Plaintiff had not engaged in substantial gainful activity since January 14, 2019, the protective filing date. He found Plaintiff has the severe impairments of obesity, degenerative disc disease,

---

[2]In her application, Plaintiff claimed disability since August 31, 2011. Plaintiff, however, had previously applied for DIB and SSI, which were denied by a different ALJ on December 22, 2017, and affirmed by the Appeals Council on June 19, 2018. In his decision dated May 6, 2020, the ALJ in this case declined to reopen Plaintiff's previous application for DIB and SSI. The ALJ found Plaintiff's new application was an implicit request to reopen the denial of DIB and SSI but determined that reopening Plaintiff's prior application was not warranted under the applicable regulations – a finding Plaintiff does not dispute. Therefore, as the issue of Plaintiff's disability had been determined through the date of the prior ALJ's decision, December 22, 2017, and Plaintiff's last date of insurance was December 31, 2016, the ALJ only considered Plaintiff's claim for SSI benefits from December 22, 2017, through the date of his decision.

myocardial infarction, hypertension, depression, post-traumatic stress disorder ("PTSD"), and diabetes with neuropathy. (Tr. 17).  He further found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1.  (Tr. 18).

As for Plaintiff's RFC, the ALJ found Plaintiff retained the ability to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b),[3] but that she had the following additional functional limitations:

> [Plaintiff] can never climb ladders, ropes, or scaffolds. She can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. She must avoid concentrated exposure to extreme heat and extreme cold. She must avoid all exposure to workplace hazards such as operational control of moving machinery and unprotected heights. She is limited to simple, routine, repetitive tasks in a low stress job defined as simple work-related decisions and few if any workplace changes and no paced production quotas. Job responsibilities will not require public interaction. She should have only occasional contact with coworkers but with no tandem tasks and occasional supervision.
>
> (Tr. 20).

At the fourth step, the ALJ found Plaintiff was unable to perform her past relevant work. (Tr. 26). At the fifth step, relying on the testimony of the VE and considering Plaintiff's age, education, work experience, and RFC, the ALJ found there were jobs existing in significant numbers in the national economy that Plaintiff could perform, including sorter, press operator, and

---

[3]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

injection molder, all of which have an exertion level of light.  (Tr. 27).  At the end of his analysis, the ALJ concluded Plaintiff was not disabled.  (Tr. 28).

## IV.  Discussion

In her Brief in Support of Complaint, Plaintiff argues that the ALJ did not make his RFC determination based on substantial evidence in the record.  Plaintiff claims the ALJ's RFC determination is not supported by any medical opinion and appears to be based on the ALJ's own interpretation of the medical records.  Plaintiff also argues that the VE's opinion conflicted with job classifications in the DOT, and in his decision the ALJ failed to identify this discrepancy and explain how he reconciled the conflict.  Defendant responds that the ALJ properly supported his RFC determination based on the medical evidence in the record and Plaintiff's own testimony.  Defendant further argues that under controlling Eighth Circuit law, there was no conflict between the VE testimony and the DOT job classifications.

### A.      The ALJ's RFC Analysis Is Supported by Substantial Evidence.

The RFC is what a claimant can do despite his or her limitations and includes an assessment of physical abilities and mental impairments. 20 C.F.R. §§ 404.1545, 416.945.  The RFC is a function-by-function assessment of an individual's ability to do work-related activities on a regular and continuing basis.  SSR 96–8p, 1996 WL 374184, at *1 (July 2, 1996).  "[A]lthough medical source opinions are considered in assessing RFC, the final determination of RFC is left to the Commissioner." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005).  It is the ALJ's responsibility to determine the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians, and the claimant's own descriptions of his or her limitations.  Combs v. Berryhill, 878 F.3d 642, 646 (8th Cir. 2017); Pearsall, 274 F.3d at 1217.  According to the Eighth Circuit, "Ultimately, the RFC determination is a 'medical question,' that 'must be

supported by some medical evidence of [the claimant's] ability to function in the workplace.'" Noerper v. Saul, 964 F.3d 738, 744 (8th Cir. 2020) (quoting Combs, 878 F.3d at 646); see also Steed v. Astrue, 524 F.3d 872, 875 (8th Cir. 2008) (ALJ's RFC assessment must be supported by medical evidence).  Therefore, an ALJ is required to consider at least some supporting evidence from a medical professional.  See Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001) (some medical evidence must support the determination of the claimant's RFC).  An ALJ's RFC determination should be upheld if it is supported by substantial evidence in the record.  See Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006).

While Plaintiff bears the burden to establish her RFC, Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004), the ALJ has an independent duty to develop the record, despite the claimant's burden.  Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) ("The ALJ must neutrally develop the facts.").  "[T]he ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace.'"  Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004) (quoting Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000)).  In some cases, the duty to develop the record requires the ALJ to obtain additional medical evidence, such as a consultative examination of the claimant, before rendering a decision.  See 20 C.F.R. §§ 404.1519a(b), 416.945a(b).  The ALJ's duty extends even to cases where the claimant is represented by an attorney at the administrative hearing.  Id., Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004) (citing Warner v. Heckler, 722 F.2d 428, 431 (8th Cir. 1983)).  "An ALJ is required to obtain additional medical evidence if the existing medical evidence is not a sufficient basis for a decision."  Naber v. Shalala, 22 F.3d 186, 189 (8th Cir. 1994).  However, "an ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the

record provides a sufficient basis for the ALJ's decision." Id. Accord Haley v. Massanari, 258 F.3d 742, 749–50 (8th Cir. 2001).

In his decision, the ALJ discussed in detail Plaintiff's medical records, her testimony, and other evidence in the record, such as her daily activities. The ALJ also evaluated the opinions of medical providers in the record. The ALJ, however, did not find any of the opinions to be controlling.[4] With regard to Plaintiff's physical limitations, the ALJ found the opinion of the non-examining medical consultant was not controlling because the ALJ believed there was evidence that Plaintiff had greater limitations than the medium exertion level.[5] The ALJ did not completely disregard the medical opinion, but he found it to be unpersuasive. The ALJ noted that Plaintiff's later treatment records supported greater limitations at the light exertion level with some additional postural and environmental limitations due to Plaintiff's uncontrolled diabetes and episodes of hypoglycemia, as well as her increased body mass.

Plaintiff does not object to the ALJ's evaluation of the medical opinions. Instead, she faults the ALJ for not relying on any medical opinions. Plaintiff contends that it appears the ALJ rejected

---

[4]In April 2019, John Duff, M.D., a non-examining expert, provided a medical opinion as to Plaintiff's physical limitations after reviewing Plaintiff's medical records. He concluded that Plaintiff could perform work at a medium exertional level with some additional postural and environmental limitations. (Tr. 144-48.) The ALJ did not agree with all of Dr. Duff's conclusions. In April 2019, Charles Watson, Ph.D., a non-examining expert, opined that Plaintiff had mild limitations in all areas of mental functioning. The ALJ rejected this opinion and wrote, "[l]ater evidence and testimony of the claimant supported more than mild limitations in her mental functioning and was consistent with a severe mental health impairment when viewed in the light most favorable to the claimant." (Tr. 25). The ALJ did not consider the opinions of James Tichenor, Ph.D., and Martin Jan Pryor, D.O., which were assessed in 2015, because these opinions were offered well before the relevant time period for Plaintiff's current claim. (Tr. 25).

[5]Plaintiff's arguments regarding the ALJ's RFC determination are limited to the impact of her physical impairments. Plaintiff does not argue that the ALJ improperly determined her RFC with regard to her mental impairments. Therefore, the Court does not address whether the ALJ properly assessed Plaintiff's RFC with regard to her mental impairments.

all the medical opinions and based Plaintiff's RFC on his own interpretation of the medical records. Plaintiff argues this was reversible error because Plaintiff's medical conditions, such as myocardial infarction, hypertension, degenerative disc disease, and diabetes with neuropathy, are complex conditions and cannot be interpreted without some medical assistance.  (ECF No. 14 at 4).  Plaintiff accuses the ALJ of impermissibly "playing doctor" in that he interpreted "raw medical data."  (Id. at 6)

  As an initial matter, the Court notes that remand is not necessary merely because the ALJ did not find any of the medical opinions fully persuasive.  There "is no requirement that an RFC finding be supported by a specific medical opinion."  Hensley v. Colvin, 829 F.3d 926, 932 (8th Cir. 2016) (citation omitted).  The Eighth Circuit has consistently affirmed decisions without specific medical opinions, if there was other evidence in the record, including medical evidence, to support the RFC determination.  See Myers v. Colvin, 721 F.3d 521, 526–27 (8th Cir. 2013) (affirming RFC determination where ALJ had discounted opinion from medical provider); Perks v. Astrue, 687 F.3d 1086, 1092–93 (8th Cir. 2012) (affirming decision by ALJ, who had rejected opinion of medical consultant and based RFC determination of medical record and claimant's reported activities); Zeiler v. Barnhart, 384 F.3d 932, 936 (8th Cir. 2004) (lack of opinion evidence not fatal to RFC determination where ALJ properly considered available medical and testimonial evidence); Sampson v. Apfel, 165 F.3d 616, 619 (8th Cir. 1999) (affirming decision where ALJ discounted the only medical opinion, because there was substantial evidence in the record as a whole to support ALJ's RFC determination).  An ALJ is not required to seek clarification in the absence of medical opinions where medical records and other evidence support the RFC determination.  Cox v. Astrue, 495 F.3d 614, 619–20 (8th Cir. 2007).

Here, the Court finds the ALJ's determination that Plaintiff could perform work at a light exertion level with some additional limitations – a more restrictive RFC than what the medical expert had opined but less restrictive than what Plaintiff claimed – is supported by substantial evidence in the record as a whole.  The ALJ's RFC determination regarding Plaintiff's physical impairments is supported by the medical records, Plaintiff's course of treatment, and other evidence in the record.  The ALJ discussed each of Plaintiff's impairments at length and adequately explained how the medical and non-medical evidence affected Plaintiff's RFC.

      1.    <u>Medical evidence</u>

With regard to Plaintiff's heart condition, the ALJ correctly noted that while Plaintiff occasionally complained of chest pain, she had no cardiac emergencies after the myocardial infarction she had experienced in early 2018.  According to the medical records, Plaintiff was seen in the ER in February 2018 for feeling wobbly with a headache and vomiting.  (Tr. 823).  She had low heart rate, high blood pressure, and elevated troponin.  Plaintiff was admitted to the hospital for non-ST-elevation myocardial infarction (NSTEMI) – also known as a heart attack.  While admitted, Plaintiff underwent cardiac imaging, including a cardiac catheterization and coronary angiography.  It was noted in the medical records that Plaintiff had a probable right coronary artery dissection.  (Tr. 831).  Plaintiff was started on beta blockers and statin and was released from the hospital after four days.  (Tr. 826).

Plaintiff returned to the ER three times in March 2018 complaining of chest pain.  Twice she was discharged the same day with doctors indicating she was having non-cardiac events.[6]  (Tr. 812, 822).  On her third visit to the ER in March 2018, she was transferred to the University of

---

[6]In these medical records, the medical providers noted that Plaintiff was not compliant with her medical treatment and regime for high blood pressure.  (Tr. 812).

Missouri (MU) Hospital for a hypertensive emergency and cardiac evaluation.  (Tr. 811).  At the MU Hospital, there was concern that Plaintiff had a coronary dissection.  Plaintiff underwent additional cardiac testing, but from the imagining there was "no evidence of coronary dissection." (Tr. 376).  It was also noted in the medical records that Plaintiff's blood pressure was controllable with oral hypertensives.  Lisinopril and metoprolol tartrate were added to Plaintiff's prescribed medications, and Plaintiff was discharged with recommendations for a low sodium diet, regular exercise, and stress reduction.  (Tr. 376).

As the ALJ indicated, Plaintiff had no further cardiac emergencies or events after March 2018.  During the relevant time period, Plaintiff was frequently seen by nurse practitioner Margaret Ernst, N.P., at the Family Health Center of Edina.  Ms. Ernst often noted in her records that Plaintiff had normal heart rate and rhythm, and she had none of the following symptoms: heart murmur, edema, chest pain, arm pain on exertion, shortness of breath when walking, palpitations, lightheadedness, calf pain, or jaw pain. (Tr. 577, 583, 588, 593, 598, 604, 608, 612, 617).  Plaintiff did have subsequent EKGs after March 2018, but they were stable and remained essentially unchanged over the relevant time period.  (Tr. 535, 539, 759-60).  Finally, Plaintiff underwent a cardiac stress test a day prior to the hearing on February 25, 2020.  The results were unremarkable as Plaintiff had a normal ejection fraction of 59%, and the transient ischemic dilation ratio was within normal limits.  (Tr. 920).  The Court finds that the ALJ's characterization of the medical records related to Plaintiff's heart condition is accurate.

With regard to Plaintiff's degenerative disc disease and neuropathy, the ALJ wrote the following:

> [Plaintiff] received minimal treatment for back pain and was recommended to stretch. She was not referred to pain management, offered injections, referred to physical therapy, or given any additional treatment recommendations her back or neck pain.  She was noted occasionally to have difficulty ambulating, but she

> always had a normal gait. She had full to near full strength in all examinations. Despite a noted history of neuropathy and her complaints of neuropathic hand and foot pain, no examinations documented reduced sensation or abnormal monofilament tests. She had no nerve conduction studies for additional testing related to neuropathy. There was no evidence of reduced grip or pinch strength.

(Tr. 21). Again, this characterization of the medical records is accurate. A November 2017 x-ray of Plaintiff's pelvis, hips, and sacroiliac joints was normal. (Tr. 563). Between December 2017 October 2019, Plaintiff visited Ms. Ernst more than 15 times for various conditions. (Tr. 603-54, 672-94). Ms. Ernst noted a number of times in her records that Plaintiff had a history of diabetic neuropathy, but that it was controlled with medication and Plaintiff denied worsening. (See, e.g., Tr. 651). There is very little in the record to indicate that Plaintiff was actively being treated for degenerative disc disease. On occasion, Ms. Ernst noted that Plaintiff was experiencing some back pain. For example, on June 27, 2019, she noted that Plaintiff had "some lower back pain on standing, extension at waist and flexion, ambulates with difficulty. No pain on [range of motion] of extremities." (Tr. 681). But Plaintiff was not given injections, referred to pain management, or physical therapy. And at every visit, Ms. Ernst noted that Plaintiff had normal strength and gait, and only on two occasions in the spring of 2019 did she note that Plaintiff had difficulty ambulating. (Tr. 604, 609, 611, 617, 619, 612, 627, 634, 639, 643, 646, 652, 675, 679, 693).

The ALJ also properly considered the effects of Plaintiff's diabetes and hypertension. He acknowledged that Plaintiff had incidents of hyper- and hypoglycemia, that she was seen in the ER for low blood sugar and was even hospitalized for four days in June 2019 for diabetic gastroparesis, all of which is supported by the record. (Tr. 21-24, 750, 755-58). The ALJ wrote that these episodes generally occurred when Plaintiff did not follow her recommended diabetic and insulin treatment. As discussed in more detail below, this observation is accurate. The ALJ also considered that there was evidence in the record that Plaintiff has experienced some falls, but

as the ALJ noted, medical providers believed the reported falls were related to low blood sugar levels, but Plaintiff's non-compliance with her prescribed diabetes regimen complicated the diagnosis.[7]  In the summer of 2019, Ms. Ernst recommended continuous glucose monitoring to determine if there was a correlation between Plaintiff's blood sugar levels and her reported falls. But, as the ALJ noted, during the monitoring Plaintiff did not document her insulin intake or take her medications as directed, rendering the testing uninformative.  Furthermore, there is no evidence that Plaintiff logged or had any falls during the time she was monitored.  (Tr. 679-83).

Likewise, the ALJ acknowledged that Plaintiff had hypertension, and he noted that she experienced a hypertensive episode, for which she was evaluated in the ER.  The Court does find that the ALJ's summary of Plaintiff's treatment in the ER for hypertension was not entirely accurate.  As the ALJ noted, Plaintiff had one episode when she was seen in the ER for elevated blood pressure in February 2019.  Plaintiff had not been taking her medication as prescribed, her blood pressure spiked at home, she took her medication, and came into the ER.  The treating doctor did not administer more medication.  Instead, Plaintiff was placed on cardiac and blood pressure monitors.  She was observed and then discharged the same day.  (Tr. 532-35).  She was instructed to take her medications as prescribed on a daily basis.  (Tr. 536).  But Plaintiff also visited the ER in September 2018 with complaints of high blood pressure, as well as headache and nausea.  Her blood pressure reading at intake was 167/75, although she claimed she had higher readings at home.  Plaintiff was observed and monitored.  She was advised to take her lisinopril and was discharged.  The visit took less than an hour.  (Tr. 797).  Also, around the time of her heart attack, in February and March 2018, Plaintiff visited the ER on a number of occasions.  (Tr. 548, 805,

---

[7]Computer tomography imaging of Plaintiff's head in February 2019 was normal.  She was not referred to a neurologist or for any additional testing related to reported falls.

812, 822, 823).  In the records for these visits, it was noted that Plaintiff was experiencing high blood pressure, in addition to other cardiac and non-cardiac issues.  (Id.)

The Court finds it was harmless error that the ALJ incorrectly stated that Plaintiff was only evaluated for elevated blood pressure one time in the ER.  Setting aside the weeks around the time of her heart attack in February and March 2018, Plaintiff visited the ER on two occasions for high blood pressure, but both times she was directed to take her blood pressure medications as prescribed, and she was not admitted.  (Tr. 532 and 797).  The record supports the ALJ's finding that since March 2018, Plaintiff's hypertension was generally controlled but for episodes when she did not take her blood pressure medications as prescribed.

In support of her argument that the ALJ improperly interpreted medical data, Plaintiff lists a number of test results and findings in the medical records.  She argues that these data demonstrate that Plaintiff's medical condition is complex, such that medical clarification was needed to evaluate her RFC.  (ECF No. 14 at 6).  First, in a record that is over 900 pages, it is not surprising that there would be test results and detailed medical findings, but the fact this information exists in the record does not mean that the ALJ improperly relied on or interpreted "raw data."  (ECF No. 14 at 6).  Plaintiff neither points to where in his decision the ALJ improperly interpreted medical data nor explains how the ALJ wrongly relied on medical findings and testing in his RFC determination.  Second, Plaintiff does not address the significance of the test results and medical findings she cites, such as explaining what additional limitations the evidence supports and what the ALJ should have included in his RFC determination that he did not.

The vast majority of the testing and medical findings Plaintiff points to in her brief relate to cardiac issues Plaintiff had in early 2018.  It is undisputed that Plaintiff went to the ER a number of times in February and March 2018, almost two years before the ALJ's decision.  During the

course of these two months, Plaintiff did undergo a number of tests, including **a cardiac catheterization and coronary angiography, and t**here is evidence that Plaintiff suffered a myocardial infarction during this time period.[8]   In his decision, the ALJ acknowledged Plaintiff had a myocardial infarction in early 2018, and he took this fact into account when determining Plaintiff's RFC.  (Tr. 17, 22).  The ALJ also considered the fact that Plaintiff had no cardiac emergencies or events after March 2018, which is supported by the evidence.  The Court has carefully reviewed the medical records in this case, and the bulk of the medical records that relate to Plaintiff's cardiac issues are from February and March 2018.  The ALJ was correct when he noted that Plaintiff suffered no additional cardiac emergencies after March 2018.  In fact, the most recent cardiac testing – a stress test taken a day before the hearing – was unremarkable, and Plaintiff had a normal ejection fraction, **and the transient ischemic dilation ratio was within normal limits.**  (Tr. 24, 26, 920).

The Court finds there is medical evidence in the record to support the ALJ's RFC determination, and the ALJ was not required to develop the record further or seek medical clarification.[9]  Myers, 721 F.3d at 526–27; Perks, 687 F.3d at 1092–93; Zeiler, 384 F.3d at 936.

---

[8]As Plaintiff notes, on February 25, 2018, Mark A. Shima, M.D., at Northeast Regional Medical Center, believed Plaintiff had a focal coronary dissection of the distal right coronary artery.  (Tr. 830).  Dr. Shima referred Plaintiff for additional testing, and she was later transferred to the MU Hospital for cardiac evaluation.  (Tr. 811).  Based on imagining done at the MU Hospital, there was "no evidence of coronary dissection" as Dr. Shima had believed.  (Tr. 376).

[9]A medical expert did offer an opinion as to Plaintiff's limitations due to her cardiac condition. Dr. Duff, a non-examining medical consultant, reviewed Plaintiff's medical records related to her cardiac condition, including those from February and March 2018, and he found she was capable of working at the medium exertion level.  The ALJ, however, did not find Dr. Duff's opinion to be entirely persuasive.  But the ALJ did not discount the expert's opinion based on his findings regarding Plaintiff's cardiac condition.  Rather, the ALJ found Dr. Duff's opinion was not controlling because the ALJ believed the treatment records supported greater limitations due to Plaintiff's uncontrolled diabetes and episodes of hypoglycemia, as well as her increased body mass, not her cardiac condition.

The fact that Plaintiff is able to point to other testing and medical findings does not mean that the ALJ's decision was not supported by substantial evidence or that the ALJ improperly interpreted that data. Adamczyk v. Saul, 817 F. App'x 287, 290 (8th Cir. 2020) (citing Fentress v. Berryhill, 854 F.3d 1016, 1021 (8th Cir. 2017), as corrected (Apr. 25, 2017) (affirming denial of disability benefits even though the claimant could "point to some evidence which detracts from the Commissioner's determination, [because] good reasons and substantial evidence on the record as a whole support the Commissioner's RFC determination.")). In this case, there is medical evidence in the record to support the ALJ's RFC determination.

### 2.    Non-compliance with medical treatment

In making his RFC determination, the ALJ also considered the fact that Plaintiff was not compliant with medical treatment and recommendations. The ALJ's observation about Plaintiff's non-compliance with doctors' recommendations is supported by the record, and Plaintiff's non-compliance was not intermittent as she claims it was. There are numerous instances in the record where Plaintiff was non-compliant with her treatment for diabetes and hypertension, which included her failure to take medication as prescribed, monitor blood pressure and blood sugar levels, and keep logs.

With regard to her medical treatment for diabetes, in October 2018, Ms. Ernst noted that Plaintiff's short-term insulin was not consistent. Plaintiff was counseled and told to keep records of her blood sugar readings, but there is no evidence that she ever kept records or provided them to Ms. Ernst. (Tr. 643). In May 2019, Ms. Ernst noted that Plaintiff was supposedly on sliding scale, short-acting insulin, but yet Plaintiff could not describe what the sliding scale regimen entailed. (Tr. 684). Ms. Ernst also noted that Plaintiff had no documentation of taking her blood sugar, despite the fact that she was supposed to be taking it four times a day. (Id.) She noted that

Plaintiff was having dietary problems, and compliance was an issue.  Plaintiff was reeducated "again."  (Id.)  When Plaintiff was admitted to the hospital in June 2019 for diabetic gastroparesis, the doctors noted that her diabetes was uncontrolled, but they were able to get her insulin back to baseline with medications.  (Tr. 756).  On a follow-up visit after her hospitalization in June 2019, Ms. Ernst noted that Plaintiff had not been monitoring her blood sugar as recommended.  (Tr. 683). Ms. Ernst noted that Plaintiff's reported falls that could be related to blood sugar levels, but she was not taking her medications as directed.  (Tr. 679-80).  Mr. Ernst put in an application for Plaintiff for a continuous glucose monitoring system, and in conjunction with the monitoring, Plaintiff was to log her falls.  (Tr. 684).  Plaintiff was approved for continuous glucose monitoring, and she returned to Ms. Ernst in July 2019 to discuss the results.  The results of the glucose monitoring, however, were not informative, because Plaintiff failed to take her medication, including insulin, as directed.  (Tr. 679).  Finally, there are many instances in the record when Ms. Ernst directed Plaintiff to keep records and logs and bring them to her follow-up appointments, but there is no evidence that Plaintiff ever did.  (Tr. 625, 643, 674, 684).

With regard to her high blood pressure, in March 2018, when she was seen in the ER for cardiac issues, Plaintiff was experiencing high blood pressure (208/110).  Plaintiff admitted that she was not taking her medication as prescribed, and the doctor counseled her on noncompliance. (Tr. 812).  Later in March 2018, when she was admitted to the hospital, her medical providers were able to get her high blood pressure under control with oral anti-hypertensives, and she was counseled on a low salt diet and regular exercise.  (Tr. 378).  In October 2018, Plaintiff admitted to not taking her blood pressure medications for several days.  (Tr. 647-48).  She came to the ER in February 2019 concerned about her high blood pressure, but she had not been taking her medication as prescribed.  Plaintiff was discharged with the advice that she was to take her

medications daily as directed.  (Tr. 532-36).  When she was admitted in June 2019, for nausea and vomiting, Plaintiff also had elevated blood pressure, which doctors were able to get under control with her regular, oral medication.  Finally, in June 2019, Ms. Ernst noted that Plaintiff admitted to not monitoring her blood pressure as recommended.  (Tr. 680).  In addition, Plaintiff was non-compliant with regard to her diet.  More than once she admitted to eating high sodium fast food, and she was frequently counseled on dietary issues.

According to the Eighth Circuit, "[i]f an impairment can be controlled by treatment or medication, it cannot be considered disabling." Brown v. Barnhart, 390 F.3d 535, 540 –41 (8th Cir. 2004) (quoting Roth v. Shalala, 45 F.3d 279, 282 (8th Cir. 1995). "Failure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits." Id.; see also 20 C.F.R. § 416.930(b).  In addition to arguing that her non-compliance was only sporadic, which is not supported by the record, Plaintiff implies that her noncompliance was justified because she could not afford the prescribed medical treatment.  ""[A] lack of sufficient financial resources to follow prescribed treatment to remedy a disabling impairment may be ... an independent basis for finding justifiable cause for noncompliance [with prescribed treatment].'" Brown, 390 F.3d at 540 (quoting Tome v. Schweiker, 724 F.2d 711, 714 (8th Cir. 1984)).  But in this case, Plaintiff sought medical treatment regularly, and she had Medicaid coverage throughout the relevant time period.  The record is lacking in evidentiary support for Plaintiff's argument that her financial status kept her from acquiring the prescribed medical treatment for her hypertension and diabetes.  Moreover, Plaintiff was non-compliant with record keeping and monitoring her blood sugar and blood pressure. There is little to no cost associated with logging blood sugar levels and blood pressure readings.

Plaintiff also argues that she was non-compliant with her diabetes medications because she experienced side effects.  In support of this argument, Plaintiff cites to a medical record from Ms. Ernst dated July 23, 2019.  The record shows that on that date, Ms. Ernst noted "patient has had some side effects and a recent hospitalization that is effective [sic] by her noncompliance of A1C." (Tr. 680).  Ms. Ernst, however, did not indicate that Plaintiff had side effects <u>due to a medication</u>. Furthermore, Ms. Ernst did not specify what the "side effects" were, and she did not instruct Plaintiff to discontinue any medications.   Instead, she counsel Plaintiff on compliance and continued Plaintiff on the same prescribed medications.  Within this record, Ms. Ernst did indicate that Plaintiff was non-compliant with her medical treatment.   Mr. Ernst noted, Plaintiff "[c]ompleted 72-hour assessment of blood sugar, unable to determine the changes based on the information due to the fact that the patient did not correctly document insulin intake.  Have discussed dietary issues several times, patient reeducate again today."  (Tr. 680).  And earlier in the same record, Ms. Ernst noted, Plaintiff "admits that she has not been taking medication as directed, unsure how much insulin she took during testing."  (Tr. 679).  There is nothing in this record to indicate that Plaintiff's non-compliance was the result of side effects from the diabetes medications.  The Court finds there is no evidence in the record that Plaintiff was experiencing side effects from her diabetes or blood pressure medications, but more importantly, that a medical provider had directed Plaintiff not to take them due to side effects.  In sum, it was not improper for the ALJ to have considered Plaintiff's noncompliance with her medical treatment in determining her RFC.  <u>Brown</u>, 390 F.3d at 540 -41.

### 3.    Other evidence in the record

In addition to the medical records and evidence of Plaintiff's non-compliance with medical treatment, the ALJ looked to other evidence in the record to support his RFC determination.  The

ALJ noted that Plaintiff prepared meals and did household chores such as laundry.  (Tr. 21).  This is supported by the record.  In fact, Plaintiff told a mental health evaluator in December 2018 that she does a lot of cleaning and even washes her windows.  (Tr. 659).  She reported caring for her dogs, one of which she characterized as a service dog.  But as the ALJ noted, there is no evidence in the record that a medical provider ever recommended a service animal or that Plaintiff was referred to a service animal organization.  (Tr. 22).  There is also evidence in the record from February 2019 that Plaintiff was carrying buckets of water to the livestock on her property.  (Tr. 22 and 651).  Plaintiff was also counseled by medical providers to regularly exercise.  See Thomas v. Berryhill, 881 F.3d 672, 676 (8th Cir. 2018) (daily activities including preparing meals, doing housework, shopping, watching television, and driving conflicted with allegations of disability); Myers v. Colvin, 721 F.3d 521, 527 (8th Cir. 2013) ("In the absence of other evidence in the record, a physician's unrestricted recommendations to increase physical exercise are inconsistent with a claim of physical limitations.").  This evidence supported the ALJ's conclusion that Plaintiff's physical impairments were not as severe as she claimed.

In sum, the Court finds that in determining Plaintiff's RFC, the ALJ properly evaluated the evidence in the record, including the medical records, and that the RFC is supported by substantial evidence.  The Court further finds that the ALJ did not impermissibly "play doctor," but properly considered medical opinions, the objective medical evidence, Plaintiff's non-compliance with medical recommendations and treatment, inconsistencies in the record, and her daily activities.  The record does contain conflicting evidence regarding the extent of Plaintiff's physical impairments, some of which might support limitations greater than those assessed by the ALJ, but the ALJ reasonably weighed the evidence in a manner consistent with the evidence and the regulations.  Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006).  It is not the Court's role to

reweigh the evidence, and there is substantial evidence in the record to support the ALJ's RFC determination that Plaintiff's physical limitations were greater than what the medical expert had opined, but less than what Plaintiff claimed.  Reece, 834 F.3d at 908; Coleman, 498 F.3d at 770.

### B.      No Discrepancy Between VE's Testimony and DOT

Plaintiff also argues that the VE's opinion conflicted with job classifications in the DOT, and the ALJ failed to explain in his decision how he resolved the discrepancy.  More specifically, with regard to mental impairments, the ALJ limited Plaintiff to the following:

> Simple, routine, repetitive tasks in a low stress job defined as simple work-related decisions and few if any workplace changes and no paced production quotas.  Job responsibilities will not require public interaction.  She should have only occasional contact with coworkers but with no tandem tasks and occasional supervision.

(Tr. 20).  The ALJ provided the VE with Plaintiff's limitations, including her mental limitations, and the VE opined that Plaintiff could perform the duties of a sorter, (DOT 222.687-014, SVP 2, light), press operator (614.685-014, SVP 2, light), and injection molder (556.684-038, SVP 2, light).  (Tr. 69-70).  All three of these jobs require level two reasoning, which is described as the ability to apply "commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations."  2 U.S. Dep't of Labor, Dictionary of Occupational Titles, 1010–11 (4th ed. 1991).  Level 2 Reasoning "is a step above Level 1 Reasoning, which requires a worker to '[a]pply commonsense understanding to carry out one- or two-step instructions' and to '[d]eal with standardized situations with occasional or no variables in or from those situations encountered on the job.'" Stanton v. Comm'r, Soc. Sec. Admin., 899 F.3d 555, 558 (8th Cir. 2018) (citing Dictionary of Occupational Titles, 1011).  Plaintiff argues that the limitation of simple, routine, repetitive tasks is not compatible with level two reasoning, and the ALJ failed to explain or resolve this conflict.

In support of her argument, Plaintiff cites to two cases from the Eighth Circuit, Hulsey v. Astrue, 622 F.3d 917 (8th Cir. 2010), and Lucy v. Chater, 113 F.3d 905 (8th Cir. 1997).[10]  These two cases are distinguishable from the case at hand.  In Lucy, the ALJ found the claimant suffered from borderline intellectual functioning.  When determining whether the claimant was capable of performing other work in the nation economy, the ALJ did not consult a VE, but rather he relied on the Medical–Vocational Guidelines and found that the claimant could engage in the full range of sedentary work.  113 F.3d at 908.  The Eighth Circuit reversed finding that the ALJ failed to employ a vocational expert's testimony, and that borderline intellectual functioning "is a significant nonexertional impairment that must be considered by a vocational expert." Id.  In this case, the ALJ did not rely on the grids but on the testimony of the VE.

In Hulsey, the ALJ also determined the claimant suffered from borderline intellectual functioning. 622 F.3d at 923.  The Eighth Circuit, however, affirmed the decision of the Appeals Council and found it had taken into account the claimant's borderline intellectual functioning when it determined that she could perform housekeeping work, although some of the housekeeping occupations in the DOT required reasoning development levels of three, four, and five.  Id.  The Eighth Circuit reconciled the supposed conflict by noted that it was "evident" that the VE had in mind the DOT for housekeeping with an SVP of two and a reasoning development level of one, as such "[t]he Appeals Council did not fail to consider [the claimant]'s borderline intellectual functioning in concluding that she could perform such work."  Id. 923-24.  Here the ALJ did not consider jobs with different levels of reasoning.

The case at bar is more analogous to Moore v. Astrue, 623 F.3d 599 (8th Cir. 2010).  In Moore, the ALJ limited the claimant to being capable of "carrying out simple job instructions and

---

[10]Plaintiff also cites to cases from other district courts, which are not controlling authority.

performing simple, routine and repetitive work activity at the unskilled task level." <u>Id.</u> at 604 (internal quotations omitted).  After being given this hypothetical, the VE identified two occupations the claimant could perform, both of which required level two reasoning, and the ALJ relied on this testimony to conclude that there were jobs in the national economy the claimant could perform.  <u>Id.</u>  The Eighth Circuit found that the ALJ did not err in relying on the VE testimony, as the ALJ did not limit the claimant to simple one- or two step instructions, and the court held that there is no conflict between carrying out simple job instructions for "simple, routine and repetitive work activity" and the requirements of level two reasoning.  <u>Id.</u>  This holding was recently affirmed in <u>Galloway v. Kijakazi</u>, 46 F.4th 686, 690 (8th Cir. 2022) ("no direct conflict between 'carrying out simple job instructions' for 'simple, routine and repetitive work activity,'" and a "vocational expert's identification of occupations involving instructions that, while potentially detailed, are not complicated or intricate.") (quoting <u>Moore</u>, 623 F.3d at 604).

Here, like in the <u>Moore</u> case, the ALJ did not limit Plaintiff reasoning to a level that corresponds with level one reasoning ability as defined by the DOT.  The ALJ did limit Plaintiff to performing "simple, routine, repetitive tasks," (Tr. 20), but he did not restrict her to performing tasks that only involve one- or two-step instructions.  The Court finds under controlling Eighth Circuit law, that there was no conflict between the hypothetical question posed by the ALJ and the testimony by the VE's opinion that Plaintiff could perform the duties of sorter, press operator, and injection molder.  <u>Moore</u>, 623 F.3d at 604.

The Eighth Circuit further directs the district courts to treat the DOT as "generic job descriptions that offer the approximate maximum requirements for each position, rather than their range." <u>Welsh v. Colvin</u>, 765 F.3d 926, 929 (8th Cir. 2014).  "[N]ot all of the jobs in every category have requirements identical to or as rigorous as those listed in the DOT."  <u>Wheeler v. Apfel</u>, 224

F.3d 891, 897 (8th Cir. 2000). The DOT itself "cautions that its descriptions may not coincide in every respect with the content of jobs as performed in particular establishments or at certain localities." Id.  Here, there is nothing in the record to suggest the ALJ had limited Plaintiff to jobs with level one reasoning – those with simple one- or two step instructions – but even if he had, "the level two reasoning definition is an upper limit across all jobs in the occupational category, not a requirement of every job within the category." Moore, 623 F.3d at 604.  There is also nothing in the record to suggest that the VE ignored the reasoning limitation contained in the ALJ's hypothetical when she opined Plaintiff could perform the duties of sorter, press operator, and injection molder. Id.; Whitehouse v. Sullivan, 949 F.2d 1005, 1006 (8th Cir. 1991) ("[T]he ALJ could properly assume that the expert framed his answers based on the factors the ALJ told him to take into account.").  It was not improper for the ALJ to have relied on the VE's opinion, because there was no conflict between the DOT and the VE's testimony.  Id.

## V.   Conclusion

The Court's task "is to determine whether the ALJ's decision 'complies with the relevant legal standards and is supported by substantial evidence in the record as a whole.'"  Halverson v. Astrue, 600 F.3d 922, 929 (8th Cir. 2010) (quoting Ford v. Astrue, 518 F.3d 979, 981 (8th Cir. 2008)).  The Court finds the ALJ's decision in this case is supported by substantial evidence in the record as a whole.  The ALJ reviewed the medical records before him and considered the limitations and restrictions imposed by the combined effects of all of Plaintiff's impairments, both physical and mental.  He considered and evaluated the medical records, opinion evidence, and Plaintiff's non-compliance with medical treatment.  The ALJ also considered Plaintiff's testimony and her described daily activities.  In addition, the ALJ properly relied on the testimony of the VE, and there was no conflict between the VE's opinion and the DOT job classifications.  In sum, after

reviewing the record in this case, the Court finds the ALJ properly explained the basis for his disability determination, and there is substantial evidence in the record as a whole to support the ALJ's findings and conclusions.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**, and Plaintiff's Complaint is **DISMISSED with prejudice**.

A separate judgment will accompany this Memorandum and Order.


*Ronnie L. White*
_____
**RONNIE L. WHITE**
**UNITED STATES DISTRICT JUDGE**


Dated this  29th  day of September, 2022.